IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MOSES LANGFORD,

       Plaintiff,
       Counter Defendant,

   v.

MAGNOLIA ADVANCED
MATERIALS, INC.,

       Defendant,
       Counter Claimant.

CIVIL ACTION FILE NO.

1:15-CV-1115-AT-JFK

## FINAL REPORT AND RECOMMENDATION

Plaintiff Moses Langford filed the above-styled employment discrimination action against Defendant Magnolia Advanced Materials, Inc. ("Magnolia"), on April 13, 2015. [Doc. 1]. Plaintiff alleges that Defendant violated Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, and 42 U.S.C. § 1981 by discriminating against him in the terms and conditions of his employment on the basis of his race, African-American. [Doc. 1, Counts I, II]. Plaintiff also alleges that Defendant subjected him to retaliation in violation of Title VII and 42 U.S.C. § 1981. [Id., Count III]. Finally, Plaintiff brings discrimination claims against Defendant based on his age pursuant to the Age Discrimination in Employment Act ("ADEA"), 29

U.S.C. § 621, *et seq.* [Id., Count IV]. Defendant has moved for summary judgment pursuant to Federal Rule of Civil Procedure 56 on Plaintiff's claims based upon the pleadings, statements of material facts, exhibits, and discovery materials submitted to the court. [Doc. 51]. Defendant Magnolia has also asserted state law counterclaims for breach of contract and violation of the Georgia Trade Secrets Act of 1990. [Doc. 9, Counts I, II]. Defendant has filed a summary judgment motion pursuant to Rule 56 on its counterclaims against Plaintiff. [Doc. 53].

## I.    Facts

When evaluating the merits of a motion for summary judgment, the court must "view the evidence and all factual inferences raised by it in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-moving party." Comer v. City of Palm Bay, Florida, 265 F.3d 1186, 1192 (11th Cir. 2001). However, mere conclusions and unsupported self-serving statements by the party opposing summary judgment are insufficient to avoid summary judgment. See Ellis v. England, 432 F.3d 1321, 1326 (11th Cir. 2005). In accordance with the foregoing principles, the following facts are deemed to be true for the limited purpose of evaluating Defendant's motions [Doc. 51, 53] for summary judgment.

2

Defendant Magnolia develops, manufactures, and markets adhesives, coatings, encapsulating and potting compounds, syntactics, epoxies, resins, and curing agents for aerospace, transportation, defense, electronics, energy, infrastructure, marine, recreation, communications, and industrial markets worldwide. [Doc. 51-3, Defendant's Statement of Material Facts ("DSMF") ¶ 1; Doc. 59, Plaintiff's Deposition on September 17, 2015 ("Pla. Dep.") at 117-18]. Randy Cunningham, General Manager and Executive Vice President of Magnolia, stated in his declaration that the company is a first-tier government contractor for federal agencies including the U.S. Navy, U.S. Air Force, and Naval Air Stations, and a subcontractor for Boeing, Lockheed, Raytheon, Northrup Grumman, ATK, Bell Helicopter, Sikorsky, General Dynamics, The Spaceship Company, BAE, and other first-tier government contractors. [Randy Cunningham's Declaration ("Cunningham Dec.") ¶ 4; DSMF ¶ 2]. Magnolia was founded in 1957, incorporated in 1958, and currently employs approximately 50 people at its facility in DeKalb County, Georgia. [Cunningham Dec. ¶ 5; Doc. 68-34; DSMF ¶ 3].

Plaintiff Langford is an African-American male and was born on November 2, 1973. [DSMF ¶ 4]. Plaintiff testified that he became employed as a Senior Chemist with Magnolia on or about September 9, 2013. [Pla. Dep. at 42; DSMF ¶ 5]. Plaintiff

3

also testified that he was hired by Mr. Cunningham and Chief Executive Officer ("CEO") Richard Wells. [Id.]. Mr. Cunningham testified that Plaintiff Langford was Magnolia's only Senior Chemist during his employment with Magnolia and that the company has not filled Plaintiff's position since his termination in January 2015. [Cunningham Dec. ¶ 6; DSMF ¶ 6]. Plaintiff likewise testified during his deposition that he was the only Senior Chemist at Magnolia.[1] [Pla. Dep. at 43]. Plaintiff's duties as Senior Chemist included, *inter alia*, creating formulas for Magnolia products, physical testing of formulas, troubleshooting formulas, reformulating as needed, and calibrating equipment. [Pla. Dep. at 61-62; DSMF ¶ 7].

---

[1]Plaintiff later stated in his declaration that Debbie Nash-Makita was also considered a Senior Chemist. [Doc. 68-13, Plaintiff's Declaration ("Pla. Dec.") ¶ 2]. The court will disregard this portion of Plaintiff's declaration testimony. In his deposition, Plaintiff gave a clear answer to an unambiguous question when he testified that he was the only Senior Chemist at Magnolia. See Van T. Junkins and Assoc., Inc. v. U.S. Industries, Inc., 736 F.2d 656, 657 (11th Cir. 1984) ("When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony."). The statement in his declaration which is inherently inconsistent with his deposition testimony on this issue was not based on newly discovered evidence and did not clarify confusing testimony. Although "'[t]his rule is applied sparingly because of the harsh effect it may have on a party's case[,]'" the court will not consider this portion of Plaintiff's declaration because it contradicts his deposition testimony without providing any valid explanation for the contradiction. Latimer v. Roaring Toyz, Inc., 601 F.3d 1224, 1237 (11th Cir. 2010) (quoting Allen v. Board of Pub. Educ. for Bibb Cty., 495 F.3d 1306, 1316 (11th Cir. 2007)).

On September 9, 2013, at the time of his hiring, Plaintiff Langford entered into a Noncompetition, Nonsolicitation, and Nondisclosure Agreement (the "Nondisclosure Agreement") with Magnolia. [Doc. 72-1, Plaintiff's Statement of Material Facts ("PSMF") ¶ 1; DSMF ¶ 8; Pla Dep. at 120-21, Ex. 5]. The Nondisclosure Agreement provides, in pertinent part:

> Employee covenants that Employee will not, during the term of Employee's employment or thereafter for so long as such information remains Confidential Information, without the prior written consent of Magnolia, publish, disclose or use for Employee's own benefit or for the benefit of a person, business or entity other than Magnolia, any Confidential Information.

[Doc. 60-1]. As Magnolia's Senior Chemist, Plaintiff was given access to the company's trade secrets and other confidential information concerning Magnolia's formulas, procedures, and processes. [DSMF ¶ 9; Cunningham Dec. ¶ 7; Pla. Dec. ¶ 3]. Magnolia also provided Plaintiff with access to a company computer to assist him with his job duties. [DSMF ¶ 10; Cunningham Dec. ¶ 8; Pla. Dec. ¶ 4].

Plaintiff testified that for the first seven months of his employment from September 9, 2013, until April 2014, he felt that his employment was satisfactory and that he had an opportunity to advance. [DSMF ¶ 11; Pla. Dep. at 122]. Mr. Wells and Mr. Cunningham agreed that initially for several months Plaintiff's performance was

5

satisfactory. [DSMF ¶ 11; Doc. 69-5, Randy Cunningham's Deposition ("Cunningham Dep.") at 21-22; Richard Wells' Deposition ("Wells Dep.") at 18-20].

In April or May 2014, Plaintiff contacted the Occupational Safety and Health Administration ("OSHA").[2]  Plaintiff complained to OSHA about unsafe work premises at Magnolia.  [Pla. Dep. at 124-38].  Plaintiff testified that he contacted OSHA anonymously and that on May 7, 2014, shortly after he made his complaint, an OSHA inspector visited Magnolia.  [Id.].

Debbie Nash-Makita, Director of Research and Development ("R & D") and Plaintiff's supervisor, testified that in October 2013, Magnolia's management directed the salaried employees in the R & D group to prepare weekly reports so that management could keep track of their work and productivity.  [DSMF ¶ 12; Deborah Nash-Makita's Declaration ("Nash-Makita Dec.") ¶¶ 9, 16, 30].  Plaintiff testified that the weekly reports started in May 2014 and that non-exempt employees were also required to submit weekly reports.  [Pla. Dep. at 222; Pla. Dec. ¶ 5].  Ms. Nash-Makita testified that she instructed employees to send their reports to her each Friday and that she provided them time to complete their reports every Friday morning.  [DSMF ¶ 13;

_____

[2]Although Plaintiff repeatedly references "OASH" in his response to Defendant's summary judgment motion, the court will assume that he means OSHA. [Doc. 72-3 at 4-6].

Nash-Makita Dec. ¶ 30]. Ms. Nash-Makita testified that she found that Plaintiff's reports often lacked adequate detail, making it difficult to determine his progress on assignments. [DSMF ¶ 14; Nash-Makita Dec. ¶¶ 34, 35, Ex. D].

On June 16, 2014, Ms. Nash-Makita and Executive Vice President/General Manager Randy Cunningham met with Plaintiff and issued him a written warning for submitting only one report in a four week period. [DSMF ¶ 15; Pla. Dep. at 149-50, Ex. 16; Nash-Makita Dec. ¶¶ 34, 35, Ex. D]. Ms. Nash-Makita testified that Plaintiff failed to provide three written weekly reports during a four week period in May and June 2014, despite having been on vacation for only four days during that time. [DSMF ¶ 14; Nash-Makita Dec. ¶¶ 34, 35, Ex. D]. Plaintiff testified that he probably failed to submit two weekly reports, not three, and that he was "taken aback" because he received the written warning on a Monday after returning from vacation. [Pla. Dep. at 152-53]. In the June 2014 written warning, Plaintiff was also warned about having a poor attitude toward cleanliness in the lab. [DSMF ¶ 15; Pla. Dep. at 149-50, Ex. 16; Nash-Makita Dec. ¶¶ 34, 35, Ex. D]. Approximately two months later, on August 12, 2014, Ms. Nash-Makita met with Plaintiff and counseled him verbally and in writing regarding Magnolia's professional expectations of him. [DSMF ¶ 16; Pla. Dep. at 165-66, Ex. 17].

7

Ms. Nash-Makita testified that Plaintiff's attitude soured toward her and others in authority at Magnolia and that he was belligerent toward her and dismissive of her authority. [Nash-Makita Dec. ¶ 44]. CEO Richard Wells likewise testified that Ms. Nash-Makita informed him that "she would ask [Plaintiff] to do some work and he would not do it. He would fight back. He would resist." [Wells Dep. at 17; PSMF ¶ 38]. Mr. Cunningham testified that when he was informed by Ms. Nash-Makita of Plaintiff's insubordination, Mr. Cunningham recommended that Ms. Nash-Makita counsel Plaintiff and have one-on-one discussions with him rather than putting written warnings in his personnel folder. [DSMF ¶ 17; Cunningham Dep. at 20]. Plaintiff, however, testified: "I was not insubordinate to Debbie Nash-Makita while employed at Magnolia. Debbie never counseled me about being insubordinate while working for Magnolia." [Pla. Dec. ¶ 7].

On October 20, 2014, Plaintiff Langford filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). [PSMF ¶ 51; Doc. 59-1 at 4; Pla. Dep. at 172-73, Ex. 2; Doc. 4-1]. Plaintiff alleged in the EEOC charge that Magnolia had subjected him to retaliation after he questioned the safety of a proposed chemical in May 2014. [Pla. Dep. at 172-73, Ex. 2; Doc. 59-1 at 4; Doc. 4-1]. Plaintiff checked the box marked "retaliation" and wrote:

8

> In May 2014, I questioned Debbie Nash-Makita, Supervisor, regarding the safety of a proposed chemical. Subsequently, Ms. Nash-Makita told me that if I contacted OSHA, I would be fired. On May 7, 2014, OSHA visited my work site. Since the OSHA visit, I have been denied accrued leave, denied bonuses, received written discipline, and condemned as a whistleblower. I believe that I have been retaliated against for opposing what I reasonably and in good faith believed to be an unlawful employment practice, in violation of Title VII of the Civil Rights Act of 1964, as amended.

[Id.].

Mr. Cunningham and Ms. Nash-Makita testified that on October 20, October 29, and November 25, 2014, Magnolia experienced three Uncontrolled Exothermic Events ("UEEs"). [DSMF ¶ 20; Cunningham Dec. ¶ 9; Nash-Makita Dec. ¶ 50]. A UEE results when two chemicals are combined in the wrong mass and ratio, creating dangerous amounts of smoke and heat. [Cunningham Dec. ¶ 9]. These were the first UEEs in Magnolia's 57 years in business. [Nash-Makita Dec. ¶ 50]. Plaintiff, however, testified that a UEE did not occur on October 29, 2014, because the "formulator did not add the material necessary to create a UEE." [Pla. Dec. ¶ 10]. Mr. Cunningham and Ms. Nash-Makita testified that the UEEs required evacuation of Magnolia's building and resulted in significant disruption to the company's operations. [DSMF ¶ 21; Nash-Makita Dec. ¶ 50; Cunningham Dec. ¶ 9]. Mr. Wells testified that two of the UEEs "could have actually brought the building down and killed people."

9

[Wells Dep. at 41]. Plaintiff, however, testified that only the third event on November 25 required employees to leave the building. [Pla. Dec. ¶ 10].

Mr. Wells and Mr. Cunningham testified that after the November 25th UEE, they began to suspect that Plaintiff Langford could be involved in the UEEs. [Cunningham Dep. at 32-33, 37-38; Wells Dep. at 39-44]. Mr. Cunningham testified that after the UEE on November 25, 2014, he watched the video of what "took place that day and who was there and where people were during – preceding that exothermic event and during the exothermic event." [Cunningham Dep. at 32]. Mr. Cunningham was asked and testified to the following:

> Q. What did you see Mr. Langford doing in the video?
> A. On that video, upon Mr. Langford leaving the building, I saw him and Dexter Hawkins high-fiving one another in the parking lot of the Jiffy Lube next door, which is where one of the cameras was pointed, and that they were dancing. I also saw Mr. Langford taking pictures of incoming fire trucks and police cars to the facility on his cell phone. And there was also video footage of Mr. Langford standing down next to the street looking up and down the street as if he was anticipating someone. A few minutes after that – I saw that on the video, I saw a car pull up into the driveway, a person got out, walked up to Debbie Nash-Makita and she told me that that person had identified themselves as an OSHA inspector. And I saw Mr. Langford standing behind Debbie Nash-Makita listening to what the OSHA inspector had to say.

[Cunningham Dep. at 32-33]. Plaintiff, however, testified that he never saw Dexter Hawkins on November 25, 2014, the day of the third UEE. [Pla. Dec. ¶ 12]. Plaintiff

10

testified, "Cunningham's allegation that he saw me on a video high-fiving Dexter on the day the building was evacuated is a fabrication. . . . I was concerned about myself and the safety of other people. I was helping to get out of the people [sic] and making sure anyone who needed medical attention received it." [Id.]. Ms. Nash-Makita testified that on the day before the November 25th UEE, she saw Plaintiff Langford "in the corner of the plant talking to plant employee Dexter Hawkins after the other employees had gone home." [Nash-Makita Dec. ¶ 51]. Ms. Nash-Makita testified that "the timing and location of the conversation was suspicious because Mr. Hawkins had been in the lab that morning without his supervisor's permission (Mr. Hawkins did not work in the lab), and Mr. Langford was now in the plant without my permission." [Id.]. But Plaintiff testified, "I did not see Dexter [Hawkins] during the week of the November event. I never talked with Dexter a couple of days before the event." [Pla. Dec. ¶ 14].

Mr. Cunningham testified that Magnolia's management contacted the Chamblee Police Department, the Federal Bureau of Investigation ("FBI"), the Bureau of Industry and Security ("BIS") of the Department of Commerce, and the Department of Homeland Security ("DHS") for assistance in the investigation of the UEEs. [DSMF ¶ 24; Cunningham Dec. ¶ 11]. Mr. Wells wrote a letter to the Chamblee Police

11

Department on January 8, 2015.  [PSMF ¶ 47; Doc. 68-17].  The letter stated, *inter alia*:

> Magnolia celebrated our 57th anniversary in February, 2014.  For the first 57 years and 3 months, we never had an OSHA visit, or an EEOC complaint.  In that same period, we did not record a major exothermic event.  Since May, 2014, we have had two EEOC complaints (June and October); both dismissed.   We have had two anonymous OSHA complaints (May and November).  The first was dismissed and we expect the second to be dismissed.   We have had two major Uncontrolled Exothermic Events within 5 weeks (October 20th, and November 25th), and one minor Uncontrolled Exothermic Event (October 29th), which could easily have been a major event were it not for the quick thinking of one of our employees.

[Doc. 68-17 at 4-5; PSMF ¶ 47].  The letter also noted that Dexter Hawkins was the Formulation Foreman who was in charge of ensuring the proper formulation of Magnolia products at the time of the three UEEs and that Mr. Hawkins had been fired for gross negligence.  [Doc. 68-17 at 3].

According to Mr. Cunningham, the FBI, BIS, and DHS began to investigate the UEEs, and one of the law enforcement agencies recommended that Magnolia review employees' company email accounts.  [DSMF ¶ 25; Cunningham Dec. ¶ 12].  Plaintiff testified:

> In January of 2015, Magnolia removed the computer located at my desk. Magnolia also removed the computer located at [the workspace of] Gary Betzel, a quality control technician working in the R & D area.  I started

12

> using Adam Bar's computer because I didn't have a computer to use.
> After I started using Adam's computer, Magnolia came and took that
> computer.  Magnolia restricted my use of computers.

[Pla. Dec. ¶ 11].  Mr. Cunningham testified that Magnolia first reviewed the computers

of Plaintiff Langford and Junior Chemist Adam Baer, a white male under 40 who

worked with Plaintiff.  [DSMF ¶ 26; Cunningham Dec. ¶ 13].  While reviewing

Plaintiff's Magnolia email account on January 12 and 13, 2015, Mr. Cunningham

discovered that Plaintiff had sent emails containing Magnolia's trade secrets and other

confidential information from his company email account to his personal email

account. [DSMF ¶ 27; Cunningham Dep. at 11; Cunningham Dec. ¶ 14].  Ms. Nash-

Makita testified that she did not give Plaintiff permission to send confidential

information to his personal email account.  [Nash-Makita Dec. ¶ 24; DSMF ¶ 28].

During Mr. Cunningham's review of Plaintiff's Magnolia email account, Mr.

Cunningham discovered that on or about May 29, 2014, Plaintiff had sent a

confidential master spreadsheet for use in all Magnolia development projects (the "Mix

Ratio Spreadsheet") from his company email account to his personal email account.

[DSMF ¶ 29; Cunningham Dec. ¶ 15, Ex. A; Pla. Dep. at 13].  Ms. Nash-Makita and

Mr. Cunningham testified that the Mix Ratio Spreadsheet was developed by Magnolia

employees and is housed on the Magnolia server, contains Magnolia's internal raw

13

materials product codes, is confidential, and is not shared outside the company.[3] [Nash-Makita Dec. ¶ 24; Cunningham Dec. ¶¶ 16, 17; DSMF ¶ 30]. Mr. Cunningham testified that by manipulating raw materials and their concentrations in the Mix Ratio Spreadsheet, Magnolia employees can create the correct ratio for any multi-component development project. [Cunningham Dec. ¶ 19; DSMF ¶ 31].

During his review of Plaintiff's company computer, Mr. Cunningham also discovered that on or about November 13, 2014, Plaintiff had sent from his company email account to his personal email account a spreadsheet titled "Screening Formulas for Cold Cure ReflectorLock" ("Screening Formulas"). [Cunningham Dec. ¶ 21, Ex. B; DSMF ¶ 32]. Mr. Cunningham testified that the Screening Formulas contained experimental formulas for an enhancement of a long-standing Magnolia product–a roadway adhesive sold under the trade name ReflectorLock IV–which would enable ReflectorLock IV to cure in cold temperatures, thereby extending the working season

---

[3]According to Plaintiff, the mathematical equations inserted in the spreadsheet are not proprietary. Plaintiff also testified that the equations were not created by Magnolia employees and have been used within the epoxy industry for over 50 years. [Pla. Dec. ¶ 17]. However, even assuming that the mathematical equations in the spreadsheet are not proprietary, this fact does not contradict the testimony from Ms. Nash-Makita and Mr. Cunningham that the Mix Ratio Spreadsheet was developed by Magnolia employees, is housed on the Magnolia server, contains Magnolia's internal raw materials product codes, is confidential, and is not shared outside the company. [Nash-Makita Dec. ¶ 24; Cunningham Dec. ¶¶ 16, 17].

14

for highway road crews. [Cunningham Dec. ¶ 22; DSMF ¶ 33]. Mr. Cunningham testified that Magnolia's competitors were unable to develop a product containing this property and that Magnolia hoped to fill this void in the market; as a result, Magnolia's research on this enhancement was very valuable. [Cunningham Dec. ¶ 22; DSMF ¶ 34]. Plaintiff testified that the formulas for ReflectorLock IV and cold cure ReflectorLock are public information and are written in AASHTO manual M237. [Pla. Dec. ¶ 20].[4]

Mr. Cunningham testified that upon further examination of Plaintiff's computer, he discovered copies of the Mix Ratio Spreadsheet and screen formulas for cold cure ReflectorLock in the recycle bin. [DSMF ¶ 35; Cunningham Dec. ¶ 25]. Three of the documents in the recycle bin had been deleted on November 13, 2014, the same day that Plaintiff had sent the Screening Formulas to his personal email account. [DSMF ¶ 36; Cunningham Dec. ¶ 25, Ex. C]. Plaintiff, however, testified, "Three of the documents in the recycle bin were deleted on November 13, 2014 is not true. I did not delete any spreadsheet from the company's computer." [Pla. Dec. ¶ 23]. Mr.

---

[4]However, Plaintiff has pointed to no evidence supporting this assertion. [Pla. Dec. ¶ 20]. Plaintiff also testified that two other companies created a reflector adhesive prior to the ReflectorLock IV, but Plaintiff has failed to explain the relevance of this assertion. [Plaintiff's Response to DSMF ¶ 34; Pla. Dec. ¶ 21].

15

Cunningham testified that he also found that Plaintiff's "Documents" folder contained confidential Magnolia information that was unrelated to Plaintiff's work and that Plaintiff's "Recent Places" folder revealed that he had been accessing files and searching for information on Magnolia's server that was unrelated to his work. [DSMF ¶ 37; Cunningham Dec. ¶ 26, Exs. D and E].  Plaintiff testified:

> I was instructed by Debbie Nash-Makita via e-mail to research aerospace products, finished products, curing agents and raw materials to obtain MSDS for chemical inventory.  This list of chemicals needed for inventory included competitor products acquired over the years. Furthermore, the MSDS was obtained for chemical transportation during the R & D laboratory move from the old facility to the new facility. Magnolia has not identified any confidential information or file that was unrelated to Langford's work during his employment.

[Pla. Dec. ¶ 24].

Mr. Cunningham testified that during his investigation of Plaintiff's computer in January 2015, he "pulled [Plaintiff's] personnel folder, reread his non-disclosure and confidentiality agreement, felt certain that those activities had breached that agreement and that was the basis for me concluding that Mr. Langford's employment should end." [Cunningham Dep. at 12].  Mr. Cunningham also testified that he believed that Plaintiff had stolen property from Magnolia when he emailed the Mix-Ratio Spreadsheet and Screening Formulas to himself without permission.  [DSMF ¶ 39;

Cunningham Dep. at 16-17].  Mr. Cunningham subsequently spoke to CEO Richard

Wells about Plaintiff, and Mr. Wells made the decision to terminate Plaintiff's

employment. [DSMF ¶ 43; Cunningham Dep. at 10; Wells Dep. at 8].  Mr. Wells was

asked and testified to the following:

> Q.  Well, if you could please explain in specific details what motivated
> you to fire Mr. Langford in January of 2015. . . .
> A.  We discovered that in reading corporate e-mails on his corporate
> computer that he had sent Magnolia proprietary information–confidential
> information to his home in the spring of 2014 in the form of a mixed ratio
> spreadsheet which is something we use to develop formulas.  We
> discovered that he had sent on, I believe November 13th a formula for a
> product we now call reflector lock four to his home–his personal e-mail.
> He had been counseled numerous times for being insubordinate.  He had
> been counseled numerous times on his performance.  We, at that point in
> time, gave employees three quarters to come back up to speed.  In the
> first couple of quarters he was a very good employee and then something
> switched and he started deteriorating.  I still don't know what that is.  So
> we fired him because–we fired him specifically because of the theft of
> intellectual property and breach of contract.  We were hoping to get him
> back to becoming a very good and productive employee.

[Wells Dep. at 11-12].  Mr. Wells had not seen Plaintiff's performance reviews or the

written warning given to Plaintiff before he made the decision to terminate Plaintiff's

employment.  [Wells Dep. at 48-49, 53].

Mr. Wells testified that he believes that Plaintiff stole the Mix Ratio Spreadsheet and the ReflectorLock formula. [PSMF ¶ 12; Wells Dep. at 12-13]. Mr. Wells was asked and testified to the following:

> Q. Why do you believe he was – why do you believe he stole it? I mean, it's in an e-mail. What made you think he's stealing it?
> A. He sent the e-mail from his company account to his personal account for no valid business reason. . . . He doesn't have a valid reason. He does not work at home. . . .
> Q. Did you speak to Mr. Langford about sending e-mails to his personal e-mail account?
> A. It's in the company manual that you don't do that.

[Wells Dep. at 13; PSMF ¶¶ 13, 14, 16]. Mr. Wells testified that he did not see anything in the "Confidential Information" section of the Nondisclosure Agreement that prohibits employees from taking any confidential information home. [PSMF ¶ 18; Wells Dep. at 23; Doc. 60-1 at 2]. Mr. Wells acknowledged that the Nondisclosure Agreement asked employees to return confidential information and documents after being terminated. [PSMF ¶ 19; Wells Dep. at 24-25]. Mr. Wells also testified:

> In reading his e-mails we discovered that he had erased e-mails, that he possibly had fabricated e-mails, that he had erased the formula–had downloaded the formula from the server to his local C drive, incorporated it into an e-mail that was sent to his personal computer at his home or wherever his personal computer is and then erased the evidence. So we figured he had consciousness of guilt.

[Wells Dep. at 14].

18

Mr. Wells testified that at the time the decision was made to terminate Plaintiff's employment, he believed that there was a possibility that Plaintiff was publishing and disclosing confidential information for his own benefit, for the benefit of another person, and for the benefit of another company. [Wells Dep. at 31-46; PSMF ¶¶ 25-28, 30-33]. When Mr. Wells was asked what facts gave him this belief, he testified:

> For the first 57 years of the operation of the business we operated in a relatively safe operation. No major exotherms. Within a period of five weeks in the fall of 2014, [we had] three exothermic events – uncontrolled exothermic events occurred. We believed – I believed that if [a competitor] was behind them, they would need someone with chemical knowledge operating within Magnolia that had the opportunity to set up the uncontrolled exothermic events. Mr. Langford had that knowledge.

[Wells Dep. at 44-45]. Mr. Wells testified that he had facts to support his belief that Plaintiff was soliciting Magnolia's suppliers. [PSMF ¶ 22]. Mr. Wells believes that Plaintiff was soliciting Magnolia's suppliers because of Plaintiff's internet search history. [PSMF ¶ 23].

Plaintiff testified that on January 22, 2015, agents from the FBI, DHS, and BIS questioned him at Magnolia's offices for roughly two hours. [Pla. Dep. at 45-47; DSMF ¶ 48]. According to Plaintiff, on the same day that he was questioned by the law enforcement agencies, Mr. Cunningham and Magnolia's plant manager told

19

Plaintiff that he was terminated because he violated his confidentiality agreement. [Pla. Dep. at 42, 45-46; DSMF ¶ 49].

Plaintiff filed a charge of discrimination against Magnolia with the EEOC on February 4, 2015, less than two weeks after being terminated. [Pla. Dep. at 173, Ex. 3, Doc. 59-1 at 5]. Plaintiff checked the boxes marked "race," "retaliation," and "age," and alleged that the complained-of discrimination took place on January 22, 2015, when he was discharged. [Id.]. Plaintiff asserted the following, in part:

> I. I was hired by the above-named employer on September 9, 2013, and last held the position of Senior Chemist. On October 20, 2014, I filed EEOC Charge 410-2014-05958. On January 22, 2015, I was discharged.
>
> II. The reason I was given for discharge was for violating the Non-Disclosure Agreement.
>
> III. I believe that I have been discriminated against based on my age (41) in violation of the Age Discrimination in Employment Act of 1967, as amended and race (African American) and in retaliation for opposing unlawful employment practices in violation of Title VII of the Civil Rights Act of 1964, as amended.

[Id.].

On September 13, 2013, September 17, 2013, and May 1, 2014, Debbie Nash-Makita sent work emails to Plaintiff's personal email account. [PSMF ¶ 8; Doc. 68-19; Doc. 68-20; Doc. 68-21; Doc. 68-23; Doc. 68-30]. None of these emails included

20

formulas. [Id.]. However, Ms. Nash-Makita sent an email to Plaintiff's personal email account on February 12, 2014, which did include an attachment containing the formula for Magnolia's P30 product. [Doc. 68-22]. On that day, Magnolia's facility was closed due to a snowstorm. [Nash-Makita Dec. ¶ 23; Doc. 68-26]. Ms. Nash-Makita asked Plaintiff to work from home that day. [Id.]. She wrote the following, in part: "I am hoping we can get credit for working if we work from home today, so I'm asking everyone to work on some research for future projects. During your captivity today, can you work on gaining knowledge for polyurea chemistry? I've attached some information, as well as the P30 formula. We will probably be working to find alternative formulas to P30 that will be more cost effective." [Doc. 68-22].

On May 8, 2015, approximately three and a half months after Plaintiff was terminated, Mr. Cunningham issued a final written warning to Debbie Nash-Makita. [Doc. 68-26]. The warning stated, in pertinent part:

> In connection with our investigation of the misappropriation of trade secrets and other confidential information by Moses Langford, we have learned that you sent e-mails from your Magnolia company account to Mr. Langford's personal e-mail account. Of particular concern is an e-mail you sent on February 12, 2014, which we did not discover until the National Labors Relations Board brought it to our attention last week. This e-mail contained a preliminary formula for Magnolia's P30 product. By sending the formula to an e-mail account outside of Magnolia, you put our trade secrets and other confidential information at risk, in direct

21

> violation of company policy. We understand that there were extenuating circumstances, in that you sent this e-mail to Mr. Langford on a day when the facility was closed because of severe weather in connection with a request that he perform research at home. However, your actions created an unacceptable risk of disclosure of Magnolia's trade secrets and other confidential information. . . . Given your years of service to Magnolia and the extenuating circumstances, we have decided instead to provide you with this Final Written Warning, to demote you to Research and Development Specialist, and to reduce your pay accordingly.

[Doc. 68-26].

Additional facts will be set forth as necessary during discussion of Plaintiff's claims.

## II.    Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides, "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (amended 2010). Rule 56(a) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 106 S. Ct. 2548, 2552 (1986). The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed

verdict where there can be but one reasonable conclusion.  See Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 2511 (1986).

The movant bears the initial burden of asserting the basis of his motion, and that burden is a light one.  See Celotex, 106 S. Ct. at 2553.  The movant is not required to negate his opponent's claim.  See id.  Rather, the movant may discharge this burden merely by "'showing' - that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case."  Id. at 2554.

When evaluating a motion for summary judgment, the court must view the evidence and factual inferences in the light most favorable to the nonmoving party. See Frederick v. Sprint/United Mgmt. Co., 246 F.3d 1305, 1309 (11th Cir. 2001). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 106 S. Ct. 1348, 1356 (1986).  Instead, "the nonmoving party must present evidence beyond the pleadings showing that a reasonable jury could find in its favor."  Fickling v. United States, 507 F.3d 1302, 1304 (11th Cir. 2007) (citing Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990)).

The court will apply these standards in ruling on Defendant's motions for summary judgment.

23

### III.    Discussion of Plaintiff's Claims

Plaintiff Moses Langford alleges that Defendant Magnolia subjected him to retaliation and discrimination based on race and age. [Doc. 1]. In Counts One and Two of his complaint, Plaintiff asserts that Defendant terminated his employment based on his race in violation of Title VII and 42 U.S.C. § 1981. [Id., Counts I, II]. In Count Three, Plaintiff alleges that Defendant retaliated against him by terminating his employment in violation of Title VII and § 1981. [Id., Count III]. Plaintiff asserts in Count Four of his complaint that Defendant terminated his employment on the basis of his age in violation of the ADEA. [Id., Count IV].

### A.    Discriminatory Termination Claims based on Race and Age

Plaintiff seeks to use § 1981 as a parallel basis for relief with his Title VII claim that he was terminated based on his race. [Doc. 1, Counts I, II]. Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race. . . ." 42 U.S.C. § 2000e-2(a)(1). Section 1981 provides, in pertinent part: "All persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens. . . ." 42 U.S.C. § 1981(a). The elements required to establish a § 1981 claim mirror those required for a Title VII claim. As the Eleventh

24

Circuit has noted, "Both of these statutes have the same requirements of proof and use the same analytical framework, therefore we shall explicitly address the Title VII claim with the understanding that the analysis applies to the § 1981 claim as well." Standard v. A.B.E.L. Services, Inc., 161 F.3d 1318, 1330 (11th Cir. 1998); accord Springer v. Convergys Customer Mgmt. Group Inc., 509 F.3d 1344, 1347 n.1 (11th Cir. 2007). This court will do the same.

Plaintiff also alleges that Defendant violated the ADEA by terminating his employment on the basis of his age. [Doc. 1, Count IV]. The ADEA provides in pertinent part:

> It shall be unlawful for an employer– (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age. . . .

29 U.S.C. § 623(a)(1). In order to show age discrimination, a plaintiff must offer evidence sufficient to establish that age was the "but-for" cause of the challenged employment decision. See Gross v. FBL Fin. Servs., Inc., 129 S. Ct. 2343, 2350-52 (2009); Sims v. MVM, Inc., 704 F.3d 1327, 1332 (11th Cir. 2013).

In a disparate treatment action, the plaintiff carries the burden of demonstrating that the defendant has unlawfully discriminated against him. See Texas Dep't of

Community Affairs v. Burdine, 101 S. Ct. 1089, 1093-95 (1981). "A plaintiff may prove a claim of intentional discrimination through direct evidence, circumstantial evidence, or through statistical proof." Rioux v. City of Atlanta, Georgia, 520 F.3d 1269, 1274 (11ᵗʰ Cir. 2008); accord Sims, 704 F.3d at 1332 ("A plaintiff can establish age discrimination through either direct or circumstantial evidence."). In the present case, Plaintiff Langford relies on circumstantial evidence to support his claims that he was terminated based on his race and age. The court, therefore, will use the framework articulated in McDonnell Douglas Corp. v. Green, 93 S. Ct. 1817, 1824-25 (1973), to evaluate his claims of discriminatory termination based on both race and age.[5] See

_____

[5]"Discrimination claims brought under Title VII . . . are typically categorized as either mixed-motive or single-motive claims." Quigg v. Thomas County School District, 814 F.3d 1227, 1235 (11ᵗʰ Cir. 2016). A plaintiff asserting a single-motive or "pretext" claim must show that illegal bias was the true reason for an adverse employment action. See id. In contrast, a plaintiff asserting a mixed-motive claim must show that illegal bias "was a motivating factor for an adverse employment action, even though other factors also motivated the action." Id. (citations and internal quotation marks omitted). The Eleventh Circuit recently held "that the McDonnell Douglas framework is not applicable to mixed-motive discrimination claims based on circumstantial evidence[.]" Id. at 1245. Instead, a plaintiff asserting a mixed-motive claim need only offer evidence sufficient for a reasonable jury to conclude that: (1) the employer took an adverse employment action against the plaintiff, and (2) a protected characteristic was a motivating factor for the adverse action. See id. at 1239. The McDonnell Douglas framework, however, is still applicable to single-motive cases. Id. at 1238 n.7. In Gross, the Supreme Court found that the ADEA does not authorize "a mixed-motives age discrimination claim." 129 S. Ct. at 2350. In the present case, Plaintiff does not allege a mixed-motive theory of discrimination and his legal

<u>Horn v. United Parcel Services, Inc.</u>, 433 Fed. Appx. 788, 792-93 (11th Cir. 2011) ("At the summary judgment stage, we apply the burden-shifting framework established in <u>McDonnell Douglas</u> . . . to analyze ADEA claims based on circumstantial evidence of discrimination.").   Under this framework, the allocation of burdens and order of presentation and proof are as follows: (1) the plaintiff has the burden of proving a *prima facie* case of discrimination; (2) if the plaintiff succeeds in proving the *prima facie* case, the burden (of production) shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the action taken against the employee; and (3) should the defendant carry this burden, the plaintiff must have an opportunity to prove that the legitimate reason offered by defendant was a pretext for discrimination. <u>See id.</u>

To establish a *prima facie* case of discriminatory discharge, a plaintiff must show that:  (1) he is a member of a protected class; (2) he was subjected to an adverse job action; (3) he was qualified to do the job; and (4) he was replaced by a person outside his protected class or was treated less favorably than a similarly-situated individual outside his protected class. <u>See</u> <u>Morton v. Astrue</u>, 380 Fed. Appx. 892, 894

---

arguments are framed within the <u>McDonnell Douglas</u> burden-shifting scheme as opposed to a mixed-motive framework.  Therefore, the court finds that the <u>McDonnell Douglas</u> framework applies to Plaintiff's claims.  <u>See</u> <u>Sims</u>, 704 F.3d at 1332-34.

(11th Cir. 2010) (applying identical *prima facie* elements for claims of both Title VII race discrimination and ADEA age discrimination); <u>Guimaraes v. NORS</u>, 366 Fed. Appx. 51, 55 (11th Cir. 2010) (analyzing ADEA age discrimination claim by applying *prima facie* elements for a claim of Title VII race discrimination as described by the court in <u>Knight v. Baptist Hosp. of Miami, Inc.</u>, 330 F.3d 1313, 1316 (11th Cir. 2003)); <u>Maynard v. Board of Regents of Div. of Universities of Florida Dep't of Educ. ex rel. University of South Florida</u>, 342 F.3d 1281, 1289 (11th Cir. 2003). Defendant acknowledges that Plaintiff is able to establish the first three *prima facie* elements in support of both his race-based and age-based discriminatory termination claims. Plaintiff Langford is African-American and was 42 years old when he was terminated from his employment with Defendant Magnolia. [DSMF ¶ 4; Doc. 51-2 at 14-15]. Plaintiff was also qualified for his position as a Senior Chemist. [DSMF ¶ 5; Doc. 51-2 at 14-15].

The final *prima facie* element requires Plaintiff to offer evidence that would permit a reasonable jury to conclude that he was replaced by a person outside his protected class or was treated less favorably than a similarly-situated individual outside his protected class. The evidence before the court reveals that Plaintiff Langford was Defendant Magnolia's only Senior Chemist during his employment with Magnolia and

28

that the company has not filled Plaintiff's position since his termination in January 2015. [Cunningham Dec. ¶ 6; DSMF ¶ 6]. Therefore, Plaintiff cannot show that he was replaced by a person outside his protected class. Plaintiff, however, argues that Defendant treated Debbie Nash-Makita more favorably than Plaintiff, despite the fact that she engaged in similar misconduct. Plaintiff's argument on this issue consists of the following:

> Debbie sent emails with attachments to Langford's email account. (Exhibits 17, 6, 7, 8, 9, 10). Although Debbie sent emails to Langford's account, she wasn't fired. (Exhibit 13). Debbie was similarly situated to Langford but she was treated differently. Langford has proven a prima facie case.

[Doc. 72-3 at 11]. The court finds that Plaintiff has failed to satisfy his burden at the *prima facie* stage.

With regard to Plaintiff's age discrimination claim brought pursuant to the ADEA, his claim fails for the simple reason that the comparator he points to is not younger than himself. Plaintiff asserts in his complaint that "Defendant fired Plaintiff because he is over the age of 40." [Doc. 1 ¶ 63]. Plaintiff was born on November 2, 1973, and was 42 years old at the time of his termination. [DSMF ¶ 4]. Although Plaintiff claims that Ms. Nash-Makita is a proper comparator, she is more than ten years older than Plaintiff. Ms. Nash-Makita was born on January 21, 1963, and was

29

over 50 years old during the relevant time period.  [Nash-Makita Dec. ¶ 2].  Plaintiff

has made no attempt to identify a younger comparator or to offer any other evidence

in support of his ADEA claim.[6]  Because Plaintiff is unable to establish a *prima facie*

case of age discrimination, the undersigned **RECOMMENDS** that Defendant's

summary judgment motion [Doc. 51] be **GRANTED** on Plaintiff ADEA age

discrimination claim [Doc. 1, Count IV].

Plaintiff cites to Ms. Nash-Makita as a comparator in support of his Title VII and

§ 1981 racially discriminatory termination claims.  The parties agree that Ms. Nash-

Makita is not a member of Plaintiff's racially protected class.  Defendant Magnolia also

acknowledges that Ms. Nash-Makita was treated more favorably than Plaintiff because

Ms. Nash-Makita was only demoted while Plaintiff was terminated.  However,

Defendant argues, and the court agrees, that Plaintiff's racial discrimination claim

cannot survive summary judgment because he has failed to offer evidence which would

permit a reasonable jury to conclude that he and Ms. Nash-Makita were similarly

situated.

---

[6]In fact, the only reference Plaintiff makes to age discrimination in his entire response brief is the following conclusory sentence: "Even if Langford cannot establish a prima facie case for his race and age discrimination claims there are triable issues of facts for a jury to decide."  [Doc. 72-3 at 30].

AO 72A

(Rev.8/82)

In the context of disparate discipline, the Eleventh Circuit "require[s] that a comparator be similarly situated to the plaintiff in all relevant respects" and that the "quantity and quality of the comparator's misconduct . . . be nearly identical." Stone & Webster Const., Inc. v. United States Dep't of Labor, 684 F.3d 1127, 1135 (11th Cir. 2012) (citations and internal quotation marks omitted). The most important factors that courts should consider when evaluating whether the plaintiff has been disciplined more severely than a comparator "are the nature of the offenses committed and the nature of the punishments imposed." Id. (citation and internal quotation marks omitted). Courts should "ask whether the comparator is involved in the same or similar conduct as the plaintiff yet disciplined in a different way." Id. (citation omitted).

The record evidence reveals that on January 12 and 13, 2015, General Manager/Executive Vice President Randy Cunningham reviewed Plaintiff's Magnolia email account and discovered that Plaintiff had sent emails containing Magnolia's trade secrets and other confidential information from his company email account to his personal email account. [DSMF ¶ 27; Cunningham Dep. at 11; Cunningham Dec. ¶ 14]. Among the files sent by Plaintiff to his personal email account was a confidential master spreadsheet for use in all Magnolia development projects (the "Mix Ratio Spreadsheet"). [DSMF ¶ 29; Cunningham Dec. ¶ 15, Ex. A; Pla. Dep. at 13]. Ms.

31

Nash-Makita and Mr. Cunningham testified that the Mix Ratio Spreadsheet was developed by Magnolia employees, is housed on the Magnolia server, contains Magnolia's internal raw materials product codes, is confidential, and is not shared outside the company. [Nash-Makita Dec. ¶ 24; Cunningham Dec. ¶¶ 16, 17; DSMF ¶ 30]. Mr. Cunningham also discovered that Plaintiff had sent from his company email account to his personal email account a spreadsheet titled "Screening Formulas for Cold Cure ReflectorLock" ("Screening Formulas"). [Cunningham Dec. ¶ 21, Ex. B; DSMF ¶ 32]. Plaintiff was terminated shortly after Mr. Cunningham discovered that Plaintiff had sent the Mix-Ratio Spreadsheet and Screening Formulas emails to his personal email account without permission. [DSMF ¶ 39; Cunningham Dep. at 16-17].

Unlike Plaintiff, Ms. Nash-Makita did not send confidential information to her personal email account. Instead, Ms. Nash-Makita sent an email to *Plaintiff's* personal email account on February 12, 2014, which included an attachment containing the formula for Magnolia's P30 product. [Doc. 68-22]. On that day, Magnolia's facility was closed due to a snowstorm and Ms. Nash-Makita asked Plaintiff to work from home. [Nash-Makita Dec. ¶ 23; Doc. 68-26]. Ms. Nash-Makita wrote the following, in part: "I am hoping we can get credit for working if we work from home today, so I'm asking everyone to work on some research for future projects. During your

32

captivity today, can you work on gaining knowledge for polyurea chemistry?  I've attached some information, as well as the P30 formula.  We will probably be working to find alternative formulas to P30 that will be more cost effective."  [Doc. 68-22].  Magnolia discovered that Ms. Nash-Makita had sent the confidential information more than a year later, on May 8, 2015.  At that time, Mr. Cunningham issued a final written warning to Ms. Nash-Makita.  [Doc. 68-26].  The warning informed Ms. Nash-Makita that she had been demoted and that her pay had been reduced.  [Id.].  The warning stated, in pertinent part:

> [W]e have learned that you sent e-mails from your Magnolia company account to Mr. Langford's personal e-mail account.  Of particular concern is an e-mail you sent on February 12, 2014. . . .  This e-mail contained a preliminary formula for Magnolia's P30 product.  By sending the formula to an e-mail account outside of Magnolia, you put our trade secrets and other confidential information at risk, in direct violation of company policy.  We understand that there were extenuating circumstances, in that you sent this e-mail to Mr. Langford on a day when the facility was closed because of severe weather in connection with a request that he perform research at home.  However, your actions created an unacceptable risk of disclosure of Magnolia's trade secrets and other confidential information.

[Doc. 68-26].

Ms. Nash-Makita's misconduct and the misconduct committed by Plaintiff are not so similar as to be "nearly identical," which, as noted *supra*, is the standard

33

necessary to establish a *prima facie* case.  <u>See</u> <u>Burke-Fowler v. Orange County,</u> <u>Florida,</u> 447 F.3d 1319, 1323 (11th Cir. 2006); <u>Wilson v. B/E Aerospace, Inc.,</u> 376 F.3d 1079, 1091 (11th Cir. 2004)).  As the Eleventh Circuit has emphasized, "the quantity and quality of the comparator's misconduct [must] be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." <u>McCann v. Tillman,</u> 526 F.3d 1370, 1374 (11th Cir. 2008) (citation and internal quotation marks omitted).  The record establishes that Plaintiff sent two different confidential spreadsheets from his Magnolia email account to his personal email account.  In contrast, Ms. Nash-Makita sent a confidential formula on one occasion, not to her own personal email account, but to Plaintiff's personal email account.  Furthermore, on the day that Ms. Nash-Makita sent the confidential information to Plaintiff, Magnolia's facility was closed due to a snowstorm.  Ms. Nash-Makita's email to Plaintiff indicated that she wanted him to get credit for working from home that day.  Similar extenuating circumstances did not exist when Plaintiff sent confidential information to his personal email account.  For these reasons, the court finds that the quantity and quality of Plaintiff's misconduct and the misconduct of Ms. Nash-Makita are not nearly identical.  Therefore, Plaintiff is unable to establish a *prima facie* case of racially discriminatory termination.

34

The fact that Plaintiff is unable to identify a similarly situated comparator "does not necessarily doom the plaintiff's case." Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011). Summary judgment is improper "if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." Id. (citation and internal quotation marks omitted). In the present case, however, Plaintiff has not offered any evidence other than comparator evidence in support of his claims for racial discrimination. This evidence, for the reasons discussed *supra*, would not permit a reasonable jury to find that Defendant terminated Plaintiff's employment based on his race. Because Plaintiff has failed to "carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act[,]" the court finds that Plaintiff's racial discrimination claims must be dismissed. Int'l Brotherhood of Teamsters v. United States, 97 S. Ct. 1843, 1866 (1977). It is, therefore, **RECOMMENDED** that Defendant's summary judgment motion [Doc. 51] be

**GRANTED** on Plaintiff's Title VII and § 1981 claims for racially discriminatory termination [Doc. 1, Counts I, II].[7]

### B.    Retaliatory Termination

In Count Three of Plaintiff's complaint, he asserts that Defendant subjected him to retaliation in violation of Title VII and § 1981 by terminating his employment. [Doc. 1, Count III]. Title VII acts to shield employees from retaliation for certain protected practices. Specifically, the statute provides, in pertinent part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful practice by this subchapter, or because he has made a charge, testified, assisted, or

---

[7]Plaintiff argues that Defendant could not have reasonably believed that Plaintiff's actions in sending confidential information from his company email account to his personal email account violated any of Magnolia's policies or the Nondisclosure Agreement that Plaintiff entered into with the company at the time of his hiring. [Doc. 72-3 at 13-23]. This argument need not be addressed because it is not germane to Plaintiff's *prima facie* case. Nevertheless, the court notes that Plaintiff's argument on this issue is not persuasive. The Nondisclosure Agreement provides, in pertinent part, that employees are not permitted to publish or disclose any confidential information. [Doc. 60-1]. Information such as the Mix Ratio Spreadsheet is housed on the Magnolia server, contains Magnolia's internal raw materials product codes, is confidential, and is not shared outside the company. [Nash-Makita Dec. ¶ 24; Cunningham Dec. ¶¶ 16, 17; DSMF ¶ 30]. Despite Plaintiff's contentions to the contrary, the evidence before the court establishes that Defendant could have reasonably believed that Plaintiff violated the Nondisclosure Agreement when he essentially copied confidential information to his personal email account.

36

> participated in any manner in an investigation, proceeding, or hearing
> under this subchapter.

42 U.S.C. § 2000e-3(a).  "Section 1981, U.S. Code Title 42, also prohibits retaliation

based on race, even though the statute is silent on that cause of action." Worley v. City

of Lilburn, 408 Fed. Appx. 248, 250 (11th Cir. 2011) (citing CBOCS West, Inc. v.

Humphries, 128 S. Ct. 1951 (2008)).  "To establish a claim of retaliation under Title

VII or section 1981, a plaintiff must prove that he engaged in statutorily protected

activity, he suffered a materially adverse action, and there was some causal relation

between the two events." Goldsmith v. Bagby Elevator Co., Inc., 513 F.3d 1261, 1277

(11th Cir. 2008) (citing Burlington Northern and Santa Fe Railway Co. v. White, 126

S. Ct. 2405, 2410-16 (2006)); accord Mealing v. Georgia Dep't of Juvenile Justice, 564

Fed. Appx. 421, 427 (11th Cir. 2014).  In University of Texas Southwestern Medical

Center v. Nassar, 133 S. Ct. 2517, 2534 (2013), the Supreme Court held that a plaintiff

bringing a Title VII retaliation claim "must establish that his or her protected activity

was a but-for cause of the alleged adverse action by the employer."

Plaintiff argues that he was terminated from his employment in retaliation for

engaging in protected activity.  Plaintiff's termination on January 22, 2015, is a

37

materially adverse action.  [Doc. 72-3 at 4-5; Pla. Dep. at 42].[8]  The court must next determine whether Plaintiff engaged in statutorily protected activity prior to his termination.  Title VII's anti-retaliation provision provides for two distinct types of protected conduct.  See EEOC v. Total Sys. Servs., Inc., 221 F.3d 1171, 1174–75 (11th Cir. 2000) (distinguishing between the opposition clause and the participation clause).  "An employee is protected from discrimination if (1) 'he has opposed any practice made an unlawful practice by [Title VII]' (the opposition clause) or (2) 'he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]' (the participation clause)."  Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1350 (11th Cir. 1999) (quoting § 2000e-3(a)).

---

[8]Plaintiff also alleges in his response brief that he was subjected to retaliation when he was "written-up" by Ms. Nash-Makita and Mr. Cunningham.  [Doc. 72-3 at 5].  However, Plaintiff asserted no such claim in his complaint.  Plaintiff only mentions his termination in the count of his complaint asserting the retaliation claims.  [Doc. 1, Count III].  "At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a). A plaintiff may not amend [his] complaint through argument in a brief opposing summary judgment."  Gilmour v. Gates, McDonald and Co., 382 F.3d 1312, 1315 (11th Cir. 2004) (citing Shanahan v. City of Chicago, 82 F.3d 776, 781 (7th Cir. 1996)).  Thus, despite Plaintiff's allegation of retaliatory write-ups in his response brief, no such claim is properly before the court.  Even assuming arguendo that Plaintiff had asserted a retaliation claim based on being written-up in his complaint, summary judgment would still be warranted because, as discussed infra, Plaintiff did not engage in protected activity until after he had been terminated.  No causal link could exist between the write-ups and Plaintiff's protected activity.

38

According to Plaintiff, he engaged in protected activity when he: (1) contacted the Occupational Safety and Health Administration ("OSHA"); and (2) filed a charge of discrimination with the EEOC on October 20, 2014. [Doc. 72-3 at 4]. The record reveals that Plaintiff contacted OSHA in April or May 2014 and complained about unsafe work premises. [Pla. Dep. at 124-38; Doc. 59-1 at 4; Pla. Dep. at 172-73, Ex. 2; Doc. 4-1]. And in his October 2014 EEOC charge, Plaintiff alleged that Defendant Magnolia had subjected him to retaliation after he questioned the safety of a proposed chemical in May 2014. [Pla. Dep. at 172-73, Ex. 2; Doc. 59-1 at 4; Doc. 4-1]. Plaintiff checked the box marked "retaliation" in the October 2014 EEOC charge and wrote:

> In May 2014, I questioned Debbie Nash-Makita, Supervisor, regarding the safety of a proposed chemical. Subsequently, Ms. Nash-Makita told me that if I contacted OSHA, I would be fired. On May 7, 2014, OSHA visited my work site. Since the OSHA visit, I have been denied accrued leave, denied bonuses, received written discipline, and condemned as a whistleblower. I believe that I have been retaliated against for opposing what I reasonably and in good faith believed to be an unlawful employment practice, in violation of Title VII of the Civil Rights Act of 1964, as amended.

[Id.]. The court finds that Plaintiff has failed to satisfy the protected activity element necessary to bring a retaliation claim under Title VII or § 1981.

Neither Plaintiff's complaint to OSHA in the spring of 2014 nor his October 2014 EEOC charge constitutes protected opposition activity. "In order for an

39

employee engaging in opposition activity to be protected under the anti-retaliation provision of Title VII, he or she must be opposing conduct that is made an 'unlawful employment practice' by Title VII.  Title VII defines an 'unlawful employment practice' as, *inter alia*, discrimination against an employee 'with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" <u>Pinder v. John Marshall Law School, LLC</u>, 11 F. Supp. 3d 1208, 1263 (N.D. Ga. 2014) (quoting 42 U.S.C. § 2000e-2(a)), <u>reconsideration denied</u>, 2014 WL 2858658 (N.D. Ga. June 23, 2014). "Unfair treatment, absent discrimination based on race, sex, or national origin, is *not* an unlawful employment practice under Title VII." <u>Coutu v. Martin County Board of County Commissioners</u>, 47 F.3d 1068, 1074 (11th Cir. 1995) (emphasis in original). Courts evaluating claims based on facts similar to those in the present case have consistently held that an employee who has reported OSHA violations or complained about unsafe working conditions has not engaged in statutorily protected activity. <u>See Washington v. M. Hanna Construction Inc.</u>, 299 Fed. Appx. 399, 401 (5th Cir. 2008) ("Because Title VII does not encompass violations of OSHA . . . , Plaintiff's alleged reporting of M. Hanna to authorities for violating OSHA does not qualify as protected activity under Title VII . . . .") (citations omitted); <u>Gurish v. Ohio Dep't of Mental</u>

40

Retardation & Developmental Disabilities, 2012 WL 3649359, at *2 (N.D. Ohio August 23, 2012) (finding that plaintiff could not establish a *prima facie* case of retaliation because his reports of an unsafe work environment and his "complaint with OSHA for unsafe working conditions" were not protected activity under Title VII); Rodriguez v. Beechmont Bus Service, Inc., 173 F. Supp. 2d 139, 150 (S.D. N.Y. 2001) (dismissing plaintiff's Title VII retaliation claim premised upon his cooperation with an OSHA investigation and his internal complaints of worker safety because "unsafe working conditions are not made unlawful under Title VII"). Therefore, Plaintiff did not engage in protected opposition activity before he was terminated and he makes no argument to the contrary.

Plaintiff, however, argues that his October 2014 EEOC charge constitutes protected activity under the participation clause and that "the participation clause does not require good faith and reasonableness." [Doc. 85 at 3-4]. Plaintiff alleged in the EEOC charge that he had been retaliated against for questioning the safety of a proposed chemical in May 2014. [Pla. Dep. at 172-73, Ex. 2; Doc. 59-1 at 4; Doc. 4-1]. Plaintiff also alleged in the charge that Ms. Nash-Makita told him that if he contacted OSHA, he would be fired. Finally, Plaintiff asserted in the EEOC charge that after OSHA visited Magnolia's work site in May 2014, the company subjected him

41

to a number of adverse employment actions.  [Id.].  Plaintiff argues that his October 2014 EEOC charge is protected participation activity because "simply filing a charge is enough for the participation clause protection."  [Doc. 85 at 4].   The court finds Plaintiff's argument unpersuasive.

Title VII's participation clause, as noted *supra*, protects an employee who has "made a charge . . . or participated . . . in an investigation . . . under this subchapter." 42 U.S.C. § 2000e-3(a).  In Slagle v. County of Clarion, 435 F.3d 262 (3rd Cir. 2006), the Third Circuit Court of Appeals explained:

> The language at issue has a clear and unambiguous meaning.  An employee filing a charge is protected only if the charge is brought under "this subchapter."  The phrase "this subchapter" refers specifically to 42 U.S.C. §§ 2000e through 2000e–17, the provisions that set forth an employee's rights when an employer has discriminated against him or her on the basis of race, color, sex, religion, or national origin.  It follows that a charge "under this subchapter" is a charge that alleges discrimination on the basis of those prohibited grounds.

Id. at 266-67.  "Title VII does not protect employees from retaliation for filing *any* charge alleging *any* misconduct; to gain protection, the charge–factually supported or not–must allege conduct within the scope of the statute."   Philip J. Pfeiffer, Employment Discrimination Law 415 (3rd ed. 2000) (emphasis in original).

42

In the present case, Plaintiff Langford's EEOC charge was not brought under Title VII because Plaintiff did not allege that he had been subjected to any discrimination or retaliation prohibited by Title VII (or § 1981). Plaintiff asserted in the EEOC charge that Defendant threatened him after he questioned the safety of a proposed chemical and that the company took retaliatory actions against him after OSHA visited Defendant's workplace. [Pla. Dep. at 172-73, Ex. 2; Doc. 59-1 at 4; Doc. 4-1]. But it is not unlawful under Title VII or § 1981 for an employer to maintain working conditions that are unsafe for employees due to dangerous chemicals. These statutes also do not make it unlawful for an employer to retaliate against an employee for complaining about unsafe working conditions.

Plaintiff's argument that "simply filing a charge is enough for the participation clause protection" has been rejected by other courts. [Doc. 85 at 4]. The Slagle court noted that the plaintiff's "argument that an employee is protected when s/he files any charge, regardless of its content, is to render the phrase 'under this subchapter' meaningless." 435 F.3d at 267. Similarly, in Learned v. City of Bellevue, 860 F.2d 928 (9th Cir. 1988), the Ninth Circuit held that while "it is not necessary to prove that the underlying discrimination in fact violated Title VII in order to prevail in an action charging unlawful retaliation[,] . . . [t]he mere fact that an employee is participating in

43

an investigation or proceeding involving charges of some sort of discrimination . . .

does not automatically trigger the protection afforded under section 704(a) . . . ." <u>Id.</u>

at 932.   Instead, "the underlying discrimination must be reasonably perceived as

discrimination prohibited by Title VII." <u>Id.</u>; <u>see also</u> <u>Balazs v. Liebenthal</u>, 32 F.3d

151, 159 (4th Cir. 1994) ("In this case the plaintiff's claim as first filed with the EEOC

simply alleged that he had been accused of doing something–sexually harassing his co-

workers–which he did not do.  It had nothing to do with his race, color, religion, sex

or national origin."); <u>Gurish</u>, 2012 WL 3649359, at *2 (finding that plaintiff failed to

make a *prima facie* case of retaliation pursuant to Title VII due to a lack of protected

activity when plaintiff "alleged within his EEOC charge that he was retaliated against

'after reporting an unsafe work environment'");  <u>Booth v. Pasco County, Florida</u>, 829

F. Supp. 2d 1180, 1199 (M.D. Fla. 2011) (granting summary judgment on plaintiff's

§ 1981 retaliation claim because his EEOC charge alleged religious discrimination

which is not prohibited by § 1981).

Title VII and § 1981 prohibit discrimination based on race.[9]  <u>See</u> 42 U.S.C. §

2000e-2(a)(1); 42 U.S.C. § 1981(a).   The statutes also prohibit employers from

_____

[9]Title VII also prohibits discrimination based on other protected characteristics,
but these are not relevant to Plaintiff's claims.  <u>See</u> 42 U.S.C. § 2000e-2(a)(1).

AO 72A

(Rev.8/82)

retaliating against employees for opposing conduct that is made an "unlawful employment practice" by Title VII or § 1981.  See 42 U.S.C. § 2000e-3(a); <u>CBOCS West</u>, 128 S. Ct. at 1958-61.  Plaintiff, however, has not pointed to evidence in the record showing that at any point prior to his termination, he opposed discrimination based on race or that he opposed being subjected to retaliation for complaints of racial discrimination (or any other form of unlawful discrimination).[10]  Plaintiff's complaints in the EEOC charge about unsafe work premises and about being retaliated against after OSHA visited Defendant's workplace are not protected activity under Title VII or § 1981.  Because Plaintiff did not engage in statutorily protected activity prior to his termination, no reasonable jury could find that any "protected activity was a but-for cause" of Defendant Magnolia's decision to terminate Plaintiff Langford's employment.  <u>Nassar</u>, 133 S. Ct. at 2534.  The undersigned, therefore, **RECOMMENDS** that Defendant's summary judgment motion [Doc. 51] be **GRANTED** on Plaintiff's retaliatory termination claims brought pursuant to Title VII and § 1981 [Doc. 1, Count III].

---

[10]Plaintiff filed an EEOC charge of discrimination against Magnolia on February 4, 2015, but this charge does not support his retaliation claims because it was filed approximately two weeks after he was terminated.  [Pla. Dep. at 173, Ex. 3, Doc. 59-1 at 5].

45

## IV.    Defendant's State Law Counterclaims

Defendant Magnolia has asserted state law counterclaims for breach of contract and violation of the Georgia Trade Secrets Act of 1990.  [Doc. 9, Counts I, II]. Defendant has filed a summary judgment motion pursuant to Rule 56 on its counterclaims against Plaintiff.  [Doc. 53].  Twenty-eight U.S.C. § 1367(c)(3) provides, in pertinent part, "The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction . . . ."  Because summary judgment has been recommended on all of Plaintiff's federal claims, the court **RECOMMENDS** that supplemental jurisdiction not be exercised over Defendant's state law counterclaims [Doc. 9, Counts I, II] and that they be **DISMISSED WITHOUT PREJUDICE**.  See United Mine Workers of America v. Gibbs, 86 S. Ct. 1130, 1139 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."); Mines v. Barber, 610 Fed. Appx. 838, 841 (11th Cir. 2015) ("As we conclude that the district court properly dismissed Mr. Mines' federal claims, we find that the district court did not abuse its discretion by declining to exercise supplemental jurisdiction over Mr. Mines' state law claims.  Simply stated, the district court had the authority to decline

46

supplemental jurisdiction over Mr. Mines' state claims.") (citing 28 U.S.C. § 1367(c)(3)), <u>cert. denied</u>, 136 S. Ct. 821 (2016); <u>Bio-Medical Applications of Georgia, Inc. v. City of Dalton, Georgia</u>, 685 F. Supp. 2d 1321, 1340-41 (N.D. Ga. 2009) (declining to exercise supplemental jurisdiction over plaintiff's state law claims and defendant's counterclaim after dismissing plaintiff's federal claim).  It is further **RECOMMENDED** that Defendant's summary judgment motion [Doc. 53] in favor of its counterclaims against Plaintiff be **DENIED AS MOOT**.

## V.    Conclusion

Based on the foregoing reasons and cited authority, the undersigned **RECOMMENDS** that Defendant Magnolia's summary judgment motion [Doc. 51] be **GRANTED** on all of Plaintiff Langford's claims [Doc. 1] and that these claims be **DISMISSED WITH PREJUDICE**.

The undersigned further **RECOMMENDS** that supplemental jurisdiction not be exercised over Defendant's state law counterclaims [Doc. 9, Counts I, II], that these claims be **DISMISSED WITHOUT PREJUDICE**, and that Defendant's summary judgment motion [Doc. 53] in favor of its counterclaims against Plaintiff be **DENIED AS MOOT**.

47

All pretrial matters have been concluded with the issuance of this Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1), this Court's Local Rule 72.1, and Standing Order 14-01 (N.D. Ga. August 15, 2014).  The Clerk, therefore, is **DIRECTED** to terminate the reference to the Magistrate Judge.

**SO RECOMMENDED** this 3rd day of January, 2017.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

48